In re Daniel Alan WAKEFIELD,
Debtor.

Daniel Alan Wakefield,
Plaintiff–Appellee,

v.

SWS Securities, Inc., f/k/a Southwest
Securities, Inc., Defendant–
Appellant.

No. CIV.A. 3:03–CV–0074–D.
Bankruptcy No. 01–32889–RCM–7.
Adversary No. 01–3697.

United States District Court,
N.D. Texas,
Dallas Division.

May 27, 2003.

374

Durwood D. Crawford, Dane S. Field, Goins, Underkofler, Crawford & Langdon, L.L.P., Dallas, Texas, for plaintiff-appellee.

Brian J. Hurst, Baker & McKenzie, Dallas, Texas, for defendant-appellant.

FITZWATER, District Judge.

The bankruptcy court awarded plaintiff-appellee Daniel Alan Wakefield ("Wakefield") damages under 11 U.S.C. § 525(b) and Texas libel law after finding that defendant-appellant Southwest Securities, Inc. ("SWS") had terminated his employment solely because he had filed for bankruptcy and had given false reasons in a Form U–5 for discharging him. The bankruptcy court rejected SWS's reliance on the defense of judicial estoppel to bar Wakefield's § 525(b) cause of action. It applied a purely objective standard to find that, when Wakefield failed to amend the schedules in his chapter 7 case to reflect his § 525(b) claim, he had no motive to conceal the claim. Because the bankruptcy court abused its discretion in applying a purely objective standard, the court vacates and remands for further proceedings on the judicial estoppel issue and does not reach the question whether Wakefield can recover so-called additional damages for the § 525(b) violation. The court holds that if on remand the bankruptcy court finds that Wakefield is not judicially estopped from recovering, its findings on § 525(b) liability and lost pay damages must be affirmed. The court affirms the bankruptcy court's decision that SWS committed libel and its award of damages for libel.

I

Wakefield was employed as a broker for SWS, a securities firm, from October 2000 until he was discharged in April 2001. Before working for SWS, he was employed in a similar capacity with two other securities brokers, Raymond James Financial, Inc. ("Raymond James") and Josephthal & Co., Inc. ("Josephthal"). At SWS, Raymond James, and Josephthal, Wakefield obtained front-money loans, i.e., advances against commissions that are forgiven over a negotiated period of time. If a broker leaves the firm before the loan is forgiven, he becomes obligated to pay the balance. Wakefield owed some parts of the Raymond James and Josephthal loans while employed by SWS.

In December 1999 Raymond James initiated an arbitration proceeding against Wakefield with the National Association of Securities Dealers ("NASD") seeking recovery of an unpaid front-money loan balance of $90,675.00. Raymond James obtained an award for that amount in approximately February 2001, while Wakefield was employed by SWS.

In March 2001 the NASD notified Wakefield that his broker's license would be suspended in 15 days unless he paid the award, arranged with Raymond James to pay or settle the claim, demonstrated that

the award had been or was being vacated or modified, or demonstrated that he had filed for bankruptcy or that the award had been discharged. Wakefield was unable to pay the award and instead filed for chapter 7 protection on April 3, 2001.

Kevin J. Marsh ("Marsh"), SWS's Vice President and Branch Manager, also received the NASD notice. Wakefield advised Marsh that his arbitration attorneys were aware of the letter and were attempting to resolve the matter. Marsh made several telephone calls to Raymond James on Wakefield's behalf in an unsuccessful attempt to assist him in resolving the matter by settlement or installment agreement.

On or about April 9, 2001—a few days before the NASD deadline elapsed— Marsh and Wakefield discussed the possibility that Wakefield would file for bankruptcy. Wakefield incorrectly advised Marsh that he might have to file. Unbeknown to him, his bankruptcy counsel had already filed for chapter 7 protection on April 3. Marsh advised Wakefield that filing for bankruptcy would be grounds for termination. Wakefield told his bankruptcy attorney about Marsh's comment, and the attorney contacted Marsh and informed him that discharging Wakefield solely because of his bankruptcy would violate § 525(b) of the Bankruptcy Code. Wakefield filed his bankruptcy schedules

and statement of financial affairs on or about April 19, 2001.

SWS terminated Wakefield on April 27, 2001 for the stated reasons that he would require heightened supervision, SWS would have to hire additional personnel to supervise him, and SWS did not have the resources to accommodate such supervisory needs. When SWS discharged Wakefield, it was required to file a Form U–5 with the NASD.[1] In response to a question that requested the reason for termination, SWS stated:

TERMINATED WITH CAUSE—AS WE INTERPRET, MR. WAKEFIELD WOULD REQUIRE HEIGHTENED SUPERVISION UNDER RULES & REGULATIONS DUE TO HIS PERSONAL FINANCIAL DIFFICULTIES. THIS HEIGHTENED SUPERVISION WOULD REQUIRE MORE EXTENSIVE REVIEWS OF THE REGISTERED REPRESENTATIVE['S] ACTIVITIES, AND HENCEFORTH, WOULD REQUIRE THE ADDITION OF SUPERVISORY PERSONNEL. SWS CHOSE NOT TO EMPLOY ADDITIONAL PERSONNEL FOR THAT SPECIFIC REQUIREMENT.

R. 157.

Wakefield became aware on April 27, 2001—the day he was discharged—that he had a potential § 525(b)[2] claim against SWS. SWS was a creditor in his chapter 7

---

1. A Form U–5 is a "Uniform Termination Notice for Securities Industry Registration," adopted by the NASD.

2. Section § 525(b) provides:

No private employer may terminate the employment of, or discriminate with respect to employment against, an individual who is or has been a debtor under this title, a debtor or bankrupt under the Bankruptcy Act, or an individual associated with such debtor or bankrupt, solely because such debtor or bankrupt—

(1) is or has been a debtor under this title or a debtor or bankrupt under the Bankruptcy Act;

(2) has been insolvent before the commencement of a case under this title or during the case but before the grant or denial of a discharge; or

(3) has not paid a debt that is dischargeable in a case under this title or that was discharged under the Bankruptcy Act.

case because he owed the firm $98,300 for a front-money loan. Although Wakefield scheduled this debt in Schedule F (Schedule of Creditors Holding Unsecured Nonpriority Claims), he scheduled nothing in Schedule B (Personal Property) for the category "Other contingent and unliquidated claims of every nature, including tax refunds, counterclaims of the debtor, and rights to setoff claims." R. 51.

The bankruptcy court granted Wakefield a no-asset discharge in July 2001. It discharged his indebtedness of $90,675.00 to Raymond James, $18,750 to Josephthal, and $98,300 to SWS. Wakefield later obtained employment with another securities firm, Milkie/Ferguson Investments, Inc. ("Milkie"), which imposed no form of heightened supervision.

On November 17, 2001, after he had obtained his discharge, Wakefield filed the instant adversary proceeding against SWS alleging claims for discrimination, in violation of § 525(b), libel *per se*, and negligence.[3] SWS relied on the defense of judicial estoppel to defeat Wakefield's § 525(b) claim. It contended that he had failed to include this contingent cause of action in his bankruptcy schedules and then had filed the adversary proceeding against SWS after obtaining a discharge.

Following a bench trial, the bankruptcy court rejected SWS's judicial estoppel defense and found that it had violated

§ 525(b) by terminating Wakefield's employment solely because he had filed for bankruptcy protection. The court also found that SWS had libeled Wakefield by stating in the Form U–5 false reasons for terminating his employment. It awarded Wakefield $177,176.00 in damages under § 525(b) and for libel, finding that the measure of damages was the same under both theories, and post-judgment interest. The sum of $177,176.00 consisted of $121,951.00 for lost wages, special damages of $15,225.00, and $40,000 in additional damages. The bankruptcy court also directed SWS to amend or supplement Wakefield's Form U–5.

## II

■ Although the bulk of the briefing and oral argument in this appeal has centered on whether Wakefield is precluded by judicial estoppel from recovering on his § 525(b) claim, the court must address as a threshold matter whether it can affirm the judgment based on the bankruptcy court's libel findings, without reaching judicial estoppel. The bankruptcy court found that "[d]amages for a § 525(b) violation, or libel *per se*, would be the same under the facts of this case." R. 29. As Wakefield points out in his brief, SWS "has not perfected the issue on appeal as to whether [his] Libel Per Se claim is judicially ... estopped." Appellee Br. at 17.[4]

---

**3.** The bankruptcy court implicitly rejected Wakefield's negligence claim, and he has not cross-appealed this ruling.

**4.** In its brief, SWS includes in Issue No. 1 of its statement of the issues presented only whether the bankruptcy court erred "in concluding that [Wakefield's] Section 525(b) claim was not barred by judicial estoppel[.]" Appellant Br. at vi. SWS similarly confined the judicial estoppel issue to § 525(b) in its statement of issues filed in the bankruptcy court. *See* R. 274. Although in the body of its brief SWS refers to judicial estoppel of

Wakefield's "claims," Appellant Br. at 6, 13, it does not refer specifically to his libel cause of action in its argument, *see id.* at 6–17, but instead addresses only his § 525(b) claim, *see id.* at 17, 18, 21, and 22. The bankruptcy court also viewed SWS's judicial estoppel argument as directed only at Wakefield's § 525(b) cause of action. *See* R. 17 ("[SWS] argues that [Wakefield's] § 525(b) claims are barred by judicial estoppel[.]").

The court holds that it must reach judicial estoppel. Despite the bankruptcy court's finding that the damages for violating § 525(b) and committing libel are the same, Wakefield may be able to recover damages under § 525(b) that he cannot recover for libel. The bankruptcy court awarded Wakefield $40,000 as "additional damages." R. 31. Wakefield seeks to uphold the award only as a permissible recovery for front pay under § 525(b), see Appellee Br. at 21–22, or as an award of punitive damages for libel, id. at 22.[5] There is no indication in the bankruptcy court's opinion, however, that it intended the award of $40,000 in additional damages to be an award of punitive damages for libel. This sum is therefore recoverable only under § 525(b). The court must reach the bankruptcy court's judicial estoppel decision because it impacts whether Wakefield can recover $40,000 in damages under § 525(b).

### III

SWS complains that the bankruptcy court abused its discretion in finding that SWS had failed to establish its defense of judicial estoppel. It argues that the court applied an objective standard to determine whether Wakefield had a motive to conceal his § 525(b) claim.[6]

### A

■■ "Judicial estoppel is 'a common law doctrine by which a party who has assumed one position in his pleadings may be estopped from assuming an inconsistent position[.]'" *In re Coastal Plains, Inc.,* 179 F.3d 197, 205 (5th Cir.1999) (quoting

*Brandon v. Interfirst Corp.,* 858 F.2d 266, 268 (5th Cir.1988)). "The purpose of the doctrine is 'to protect the integrity of the judicial process', by 'prevent[ing] parties from playing fast and loose with the courts to suit the exigencies of self interest[.]'" *Id.* (quoting *Brandon,* 858 F.2d at 268).

■■ Judicial estoppel is applied when two requirements are met: the position of the party to be estopped is clearly inconsistent with its previous one, and the party convinced the court to accept the previous position. *See id.* at 206. In *Coastal Plains* the Fifth Circuit at least implicitly recognized the additional requirement that the party to be estopped must have acted intentionally rather than inadvertently. *See id.* at 206 (noting that many courts impose such a requirement) and 210–13 (without expressly adopting the requirement, addressing on the merits plaintiffs' contention that they had acted unintentionally and inadvertently); *In re West Delta Oil Co. v. Hof,* 2002 WL 1963317, at *4 (E.D.La. Aug.21, 2002) (holding that *Coastal Plains* "did not blanketly adopt other circuits' requirement of intent or bad faith in order for judicial estoppel to apply," but applied elements of "inadvertence defense" "[w]ithout explicitly adopting or rejecting the possibility of an 'inadvertence defense' to judicial estoppel generally"). The *Coastal Plains* panel held that, "in considering judicial estoppel *for bankruptcy cases,* the debtor's failure to satisfy its statutory disclosure duty is 'inadvertent' only when, in general, the debtor either lacks knowledge of the undisclosed claims or has no motive for their concealment."

---

5. "There is no authority for an award of punitive damages ... under § 525(b)." *Leary v. Warnaco, Inc.,* 251 B.R. 656, 659 (S.D.N.Y. 2000).

6. SWS contends that "[t]he Bankruptcy Court erred by engrafting a backward-looking 'objective test' onto the element of motive to conceal a claim." Appellant Br. at 6; *see id.* at 13 ("[T]he Bankruptcy Court employed a backward-looking 'objective' test contrary to the letter and spirit of [*In re Coastal Plains, Inc.,* 179 F.3d 197 (5th Cir.1999) ].").

*Coastal Plains,* 179 F.3d at 210 (footnote omitted).

B

In addressing SWS's judicial estoppel defense, the bankruptcy court framed the question as whether Wakefield was judicially estopped because he did not amend his schedules before discharge and closure of his initial case. It concluded that SWS had established the first two elements of judicial estoppel. The court found that Wakefield's "position in this lawsuit is inconsistent with his schedules as filed, and not amended." R. 22. It held that the second prong of *Coastal Plains* "has been satisfied ... by the Court's granting of the discharge." *Id.* at 23. The court then addressed whether Wakefield had acted intentionally rather than inadvertently.[7]

Regarding the knowledge component for inadvertence, the bankruptcy court held that Wakefield "did not lack knowledge of the undisclosed claims." R. 23. The court then examined the motive component and interpreted *West Delta Oil* to "construe[ ] the *Coastal Plains* 'motive' test as an objective test." R. 26. Applying a purely objective standard, the court found that Wakefield did not have a motive for con-

cealment because, "objectively, [Wakefield's] concealment and subsequent discharge would have had no effect on such claim because it was owned by him and not by his estate under § 541(a)(7)." R. 26. The court recognized the possibility that there could be a subjective motive for Wakefield to omit the claim from his schedules rather than litigate whether it was a § 541(a)(7) cause of action. It rejected such a motive under an objective standard based on a view "of what the ownership of the cause of action actually is." R. 26.[8] In other words, the court essentially held that Wakefield had no objectively-ascertainable motive to conceal the § 525(b) claim because, as a matter of law, it was not property of the chapter 7 estate and need not have been disclosed in the schedules.

C

■ This court reviews the bankruptcy court's judicial estoppel decision for abuse of discretion. *Coastal Plains,* 179 F.3d at 205. "A district court by definition abuses its discretion when it makes an error of law." *Sandwich Chef of Tex., Inc. v. Reliance Nat'l Indem. Ins. Co.,* 319 F.3d

---

7. The court phrased the question as whether Wakefield's failure to disclose the claims was inadvertent. R. 23.

8. The bankruptcy court found in the alternative that, if its construction of *Coastal Plains* was incorrect, Wakefield's "non-disclosure was unintentional." R. 27. This finding is insufficient to support the conclusion that the bankruptcy court did not abuse its discretion because it is not, in fact, an *alternative* finding. Under *Coastal Plains* for one not to have acted intentionally, he must have acted inadvertently. *See Coastal Plains,* 179 F.3d at 206, 210. To have acted inadvertently in a bankruptcy case, the person must have lacked knowledge of the undisclosed claim or a motive to conceal it. *See id.* at 210. Because lack of knowledge and of motive are the components of inadvertence, a finding of uninten-

tional non-disclosure necessarily equates to a finding of lack of knowledge or of motive. Since the bankruptcy court had already found that Wakefield knew of the claim, this leaves only lack of motive. But a finding of inadvertence based on lack of motive cannot be an alternative finding to an initial finding of unintentional nondisclosure based on lack of motive.

Moreover, the bankruptcy court's decision does not otherwise support a finding of unintentional non-disclosure. The court found that Wakefield "did not lack knowledge of the undisclosed claims," R. 23, i.e., he *did* have knowledge. And, as explained below, the bankruptcy court abused its discretion by applying a purely objective test to find that Wakefield had no motive for concealment.

205, 218 (5th Cir.2003) (quoting *Koon v. United States,* 518 U.S. 81, 100, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996)). The court holds that the bankruptcy court erred as a matter of law when it interpreted *West Delta Oil* to construe the *Coastal Plains* motive test as objective, devoid of any subjective component. The court also concludes that, even if *West Delta Oil* supports such an interpretation, no binding authority (including *Coastal Plains* itself) dictates, and no other authority persuades the court, that motive should be assessed only objectively.

The bankruptcy court erred as a matter of law when it interpreted *West Delta Oil* to read *Coastal Plains* to adopt a purely objective test for assessing motive. The bankruptcy court divined this understanding of *West Delta Oil* from the following passage: "the Fifth Circuit does not require bad faith or intentional non-disclosure in bankruptcy cases." R. 26 (emphasis deleted) (quoting *West Delta Oil,* 2002 WL 1963317, at *5). In other words, the bankruptcy court transformed a holding that *subjective* bad faith and intentional non-disclosure are *unnecessary* to establish judicial estoppel into a conclusion that an *objectively*-determined absence of motive *is enough* to meet the requirement of inadvertence. The quoted text will not support such a reading. Moreover, this single sentence must be understood in the context of the *West Delta Oil* court's entire holding:

> Upon reviewing the Fifth Circuit's opinion in *Coastal,* this Court concludes that the bankruptcy court applied the proper legal standard for judicial estoppel. As noted, despite [appellants'] arguments to the contrary, the Fifth Circuit does not require bad faith or intentional non-disclosure *in bankruptcy cases.* The *Coastal* Court clearly stated that, if the first two prongs of the judicial estoppel test are met, the only kind of inadver-

tence that precludes the application of the doctrine is if the party to be estopped had no knowledge of the undisclosed claim or had no motive to conceal the claim.

*West Delta Oil,* 2002 WL 1963317, at *5. There is nothing in this reasoning to suggest that the court interpreted *Coastal Plains* as having adopted a purely objective motive standard.

Moreover, *Coastal Plains* itself does not support the view that motive is to be evaluated only objectively. It is patent that when the Fifth Circuit discussed the debtor's motive in *Coastal Plains,* it considered evidence of subjective motivation to conceal. The panel held that the debtor had an incentive to hide the potential claim because, had it been disclosed, the debtor's unsecured creditors might have opposed lifting the stay, or creditors might have chosen to bid more for the debtor's assets. *Coastal Plains,* 179 F.3d at 212–13. And if there is any doubt that *Coastal Plains* recognizes the relevance of subjective considerations in assessing motive, one need only examine the following passage from the First Circuit's opinion in *Payless Wholesale Distributors, Inc. v. Alberto Culver (P.R.) Inc.,* 989 F.2d 570 (1st Cir. 1993), which *Coastal Plains* incorporates:

> The basic principle of bankruptcy is to obtain a discharge from one's creditors in return for all one's assets, except those exempt, as a result of which creditors release their own claims and the bankrupt can start fresh. Assuming there is validity in [debtor's] present suit, it has a better plan. Conceal your claims; get rid of your creditors on the cheap, and start over with a bundle of rights. This is a palpable fraud that the court will not tolerate, even passively. [Debtor], having obtained judicial relief on the representation that no claims ex-

isted, can not now resurrect them and obtain relief on the opposite basis.

*Payless,* 989 F.2d at 571 (citation omitted) (quoted in *Coastal Plains,* 179 F.3d at 213). The First Circuit's reasoning reflects that motive is imbued with a subjective component.

Nor does the court discern a valid reason to hold that the motive determination should be purely objective. Lack of motive is one way of defeating judicial estoppel by establishing an inadvertent failure to satisfy a statutory disclosure duty in a bankruptcy case. *Coastal Plains* holds that, generally, a party either must lack knowledge of the undisclosed claim or must have no motive to conceal it. Motive and subjective intent are closely-related concepts and are often intertwined in the law. *See, e.g., Greenwood Utils. Comm'n v. Miss. Power Co.,* 751 F.2d 1484, 1498 n. 9 (5th Cir.1985) ("[D]etermining whether the petitioning conduct was a sham often involves questions of motive or subjective intent."); *Aladdin Oil Co. v. Texaco, Inc.,* 603 F.2d 1107, 1112 (5th Cir.1979) (recognizing that summary judgment is inappropriate in cases where, *inter alia,* motive, intent, and subjective feelings and reactions, consciousness, and conscience are to be searched); *St. Charles Ventures, L.L.C. v. Albertsons, Inc.,* 2003 WL 548880, at *8 (E.D.La.2003) ("motives rest in the subjective sphere of the individual" (quoting 1984 commentary to La. Civ.Code art.1950)). Motive, intent, and subjective feelings involve a party's state of mind. *See Irwin v. United States,* 558 F.2d 249, 252 (5th Cir. 1977) (including motive, intent, and subjective feelings in category of state of mind issues that are inappropriate for summary judgment). To say that motive should be determined from a purely objective standpoint is to ignore the common sense understanding that motive must be evaluated subjectively as well.

The court therefore concludes that an assessment of Wakefield's motive not to disclose his § 525(b) claim must include subjective considerations and that the bankruptcy court abused its discretion by erroneously limiting its determination to an objective evaluation.

**D**

Although the court has determined that the bankruptcy court abused its discretion, this holding does not end the matter. First, it is possible that the bankruptcy court will reach the same result on remand based on a standard that incorporates a subjective component. Although the bankruptcy court's opinion suggests a possible subjective motive for Wakefield to omit the claim from his schedules—to avoid litigation over whether his § 525(b) claim was a cause of action that was property of the estate, under § 541(a)(7), *see* R. 26—it is not clear that the court will find that Wakefield harbored this or any other motive to conceal the claim.

Second, the bankruptcy court appears to have held that, viewed objectively, Wakefield did not have a motive to conceal his § 525(b) cause of action because the claim was his personal property, not property of the chapter 7 estate. Under this reasoning, concealment of the claim could have had no effect because he, not the estate, owned it. Therefore, his schedules were not inconsistent with his subsequently-filed § 525(b) adversary proceeding because he had no duty to disclose the claim. This conclusion may be supportable, *see, e.g., Brassfield v. Jack McLendon Furniture, Inc.,* 953 F.Supp. 1424, 1432 (M.D.Ala. 1996), but it must result from analysis that gives appropriate weight to relevant subjective evidence of motive.[9]

---

**9.** Wakefield devotes considerable attention in his brief to the contention that his § 525(b)

If the bankruptcy court on remand follows reasoning that distinguishes between property of the estate and Wakefield's personal property, it should reevaluate whether this analysis must be conducted under the first prong of the *Coastal Plains* test rather than under the intentional/inadvertent component. If the court holds that Wakefield had no obligation to disclose his § 525(b) cause of action because it was not property of the estate, and that his chapter 7 schedules could not have been inconsistent with the filing of the adversary proceeding, this reasoning would fall within the first prong of *Coastal Plains.* See *Coastal Plains,* 179 F.3d at 206 (addressing whether position of party to be estopped is clearly inconsistent with previous position). Wakefield appears to recognize that this estoppel analysis should be conducted under the first element. He argues that he did not take inconsistent positions and did not convince the bankruptcy court to accept a prior inconsistent position. *See* Appellee Br. at 10.[10] The bankruptcy court, of course, found to the contrary on both the first and second *Coastal Plains* components. This approach should be reconsidered if the estate-personal property distinction is adhered to on remand.

E

Although it is uncertain whether on remand the bankruptcy court will again find that SWS failed to establish its defense of judicial estoppel, the court will reach SWS's contention that Wakefield failed to prove a § 525(b) violation. It will do so because, to decide at least one issue that is central to the court's libel analysis—whether SWS truthfully reported in the Form U–5 the reason it terminated Wakefield—it must necessarily determine whether the bankruptcy court clearly erred in finding that SWS discharged him because he had filed for bankruptcy.

 "The court reviews the bankruptcy court's conclusions of law *de novo*, but reviews its fact findings only for clear error." *In re Nary,* 253 B.R. 752, 756 (N.D.Tex.2000) (Fitzwater, J.) (quoting *In re ICH Corp.,* 230 B.R. 88, 91 n. 10 (N.D.Tex.1999) (Fitzwater, J.) (citations omitted)). "A finding of fact is clearly erroneous when, although there is evidence to support it, the reviewing court is left with the definite and firm conviction that a mistake has been committed." *In re Johnson Southwest, Inc.,* 205 B.R. 823, 827 (N.D.Tex.1997) (Fitzwater, J.) (quoting *In re Placid Oil Co.,* 158 B.R. 404, 412 (N.D.Tex.1993) (Fitzwater, J.)). "If the trier of fact's account of the evidence is plausible in light of the record viewed in its entirety, the appellate court may not reverse it." *Id.* "[T]his court does not find facts. Neither is it free to view the evidence differently as a matter of choice." *Id.* "The bankruptcy judge's 'unique perspective to evaluate the witnesses and to

---

claim was his personal property, not property of his chapter 7 estate. *See* Appellee Br. at 11–15. This issue was also a focus of the court's questioning at oral argument. In view of the basis on which the court has resolved the judicial estoppel question, however, a definitive ruling on this question must await further bankruptcy court proceedings. Nor is it necessary that the court address whether, in its analysis of judicial estoppel, the opinion of the court in *Heckler v. Product Development Corp.,* 2002 WL 824091 (N.D.Tex. Apr.29,

2002) (Buchmeyer, J.), on which SWS relies, improperly fails to distinguish cases filed under chapters 11 and 13 (or cases converted from those chapters to chapter 7 cases) from cases initiated as chapter 7 liquidations.

10. SWS maintains in its reply brief that Wakefield is attempting to challenge unfavorable bankruptcy court findings without preserving error by way of cross-appeal. *See* Appellant Rep. Br. at 1. The court need not decide this question.

consider the entire context of the evidence must be respected.'" *Id.* (quoting *Endrex Exploration Co. v. Pampell,* 97 B.R. 316, 323 (N.D.Tex.1989) (Fitzwater, J.)).

■ The bankruptcy court did not clearly err in finding that SWS discharged Wakefield solely because he had filed for chapter 7 protection. The record amply supports the court's constituent findings that Marsh knew Wakefield intended to file for bankruptcy and explicitly told him that this would be grounds for termination.[11] Even after Wakefield's bankruptcy counsel advised Marsh that this would violate § 525(b), SWS terminated him. Wakefield filed for bankruptcy protection on April 3, 2001, Marsh and Wakefield discussed the consequences of the filing within a few days thereafter, and SWS discharged him on April 27, 2001. Although SWS presented evidence that would have permitted a reasonable trier of fact to find that SWS fired Wakefield for other reasons, and not solely because of his bankruptcy, the court was free to choose which evidence it would credit. It did not clearly err. Accordingly, subject to additional proceedings on remand concerning judicial estoppel, the bankruptcy court's finding that SWS is liable for violating § 525(b) must be affirmed.

F

SWS challenges the bankruptcy court's awards of back pay and additional damages under § 525(b). The court will not reach the arguments concerning the award of $40,000 in additional damages because the bankruptcy court's decision on remand regarding judicial estoppel may render the award moot.[12]

■ SWS seeks reversal of the bankruptcy court's judgment awarding Wakefield $121,951.00 in lost pay, contending it is clearly erroneous and confers a windfall. The bankruptcy court calculated Wakefield's net lost pay by determining an average monthly compensation amount that he would have earned had he remained employed by SWS, multiplying that average by the number of months between the date he was discharged and September 1, 2002, and deducting his actual earnings from his employment at Milkie. SWS asserts that the bankruptcy court erred when it formulated his average monthly lost salary by disregarding two months when Wakefield earned little or nothing. SWS posits that, if the months of October and November 2000—the first two months that he was employed at SWS—are included, the average monthly pay is in turn reduced, resulting in lost pay of $38,671.00 rather than $121,951.00. It also contends that the bankruptcy court improperly ignored evidence that Wakefield earned far more in 2001 than he did in any previous year in the securities industry, a trend that continued in 2002 at Milkie.

SWS has not cited any authorities that address the degree of precision that the bankruptcy court must follow in calculating lost pay damages.[13] It maintains, how-

---

11. Notably, this is one of the "rare" cases in which there is direct evidence of discrimination. *See Rutherford v. Harris County, Tex.,* 197 F.3d 173, 180 n. 4 (5th Cir.1999) (holding that because direct evidence is rare in discrimination case, plaintiff must ordinarily use circumstantial evidence to satisfy burden of persuasion).

12. The court is reaching the merits of the § 525(b) liability issue, despite the necessity

for further proceedings on remand concerning judicial estoppel, because resolution of the merits is necessary to address the libel cause of action, to which judicial estoppel does not apply. *See supra* at § II.

13. Nor has SWS addressed whether the standards under § 525(b) and Texas state law are distinct.

ever, that the court should review the award for clear error. *See* Appellant Br. at 29 (asserting that "this Court should reach 'the definite and firm conviction that a mistake has been committed' by the Bankruptcy Court in calculating lost pay damages."). Wakefield asserts that the court should review the award for abuse of discretion. Appellee Br. at 19 & n. 3. The court has located no case that addresses the standard of review for a back pay award under § 525(b), although courts have held that back pay is recoverable. *See, e.g., In re Sweeney,* 113 B.R. 359, 363 (Bankr.N.D.Ohio 1990). The court need not decide this question, however, because whether review is for clear error or for abuse of discretion, the award must be affirmed.[14]

 In the context of anti-discrimination laws, the Fifth Circuit has held that it is only necessary that an award of back pay be reasonable and supported by record evidence. The amount need not be exact or certain. *See Lowe v. Southmark Corp.,* 998 F.2d 335, 337 (5th Cir.1993) (addressing claims under Equal Pay Act of 1963 and Title VII of the Civil Rights Act of 1964). Additionally, all uncertainties should be resolved against the discriminating employer. *Id.*

The bankruptcy court did not include the first two months of Wakefield's employment when it calibrated the average monthly income that it projected he would earn after he was terminated. But as Wakefield points out, there was testimony in the adversary proceeding that earnings during the first two months that a broker is employed at a new securities firm are not representative of the broker's later income. The bankruptcy court neither clearly erred nor abused its discretion by

omitting these two atypical months when it determined what Wakefield would have earned had he remained at SWS after approximately 18 months of employment. Nor did it clearly err or abuse its discretion in failing to take into account, to the degree SWS contends was necessary, Wakefield's upwardly trending income in 2001 and 2002. Because the calculation of back pay was reasonable and supported by record evidence, it must be upheld if the claim is not barred by judicial estoppel.

## IV

The court next considers whether the bankruptcy court committed reversible error in holding that Wakefield is entitled to recover against SWS for libel. As noted *supra* at § III(E), the court reviews the bankruptcy court's factual findings for clear error and its legal conclusions *de novo.*

## A

 Under Texas law, "[t]o recover on a claim for libel, a plaintiff must prove that the defendant (1) published (2) a false defamatory statement in written or printed material (3) to a third party." *Chang v. Linh Nguyen,* 81 S.W.3d 314, 318 (Tex. App.2001, no pet.) (footnote omitted) (citing *KTRK Television v. Felder,* 950 S.W.2d 100, 105 (Tex.App.1997, no writ)). Texas recognizes that certain employer communications are qualifiedly privileged. *See, e.g., Randall's Food Mkts., Inc. v. Johnson,* 891 S.W.2d 640, 646 (Tex.1995) (holding that "an employer has a conditional or qualified privilege that attaches to certain communications made in the course of an investigation following a report of employee wrongdoing."). "Proof that a

---

**14.** The court notes that, as recently as last year, the Fifth Circuit applied an abuse of discretion standard to an award of back pay under Title VII of the Civil Rights Act of 1964. *See Green v. Admn'rs of Tulane Educ. Fund,* 284 F.3d 642, 659 (5th Cir.2002).

statement was motivated by actual malice existing at the time of publication defeats the privilege. In the defamation context, a statement is made with actual malice when the statement is made with knowledge of its falsity or with reckless disregard as to its truth." *Id.* (citations omitted).

The bankruptcy court found that SWS had libeled Wakefield by making false statements in the Form U–5 that its authorized agent, Marsh, knew were false. The court recognized that the filing of a Form U–5 could be qualifiedly privileged, but it found that Wakefield had met his burden of establishing that SWS had acted with actual malice, that is, with actual knowledge of the falsity of the statements.

Under the rubric that the Form U–5 was not defamatory and was privileged, SWS contends the bankruptcy court's libel finding must be reversed because the Form U–5 account of reasons for Wakefield's termination was truthful and not defamatory, and that SWS's conduct in reporting to the NASD the reasons for Wakefield's discharge was qualifiedly privileged. It also maintains that the disclosure of SWS's reasons for terminating Wakefield was, at most, an expression of opinion.[15]

### B

### 1

■ SWS can only prevail on its contention that the Form U–5 account of reasons for Wakefield's termination was truthful and not defamatory if the bankruptcy court clearly erred in finding that the form falsely stated why SWS had discharged Wakefield. In addressing Wakefield's § 525(b) cause of action, *see supra* § III(E), the court has already held that the bankruptcy court did not clearly err in finding that SWS terminated Wakefield solely because he had filed for chapter 7 relief. It follows that the bankruptcy court did not clearly err in finding that SWS lied when it reported on the Form U–5 that it had terminated his employment because of a need for heightened supervision and a financial disincentive not to hire necessary additional personnel to accommodate the new supervisory needs. Accordingly, SWS has not demonstrated a basis for reversal on the ground that the Form U–5 was not libelous *per se* because it was truthful and not defamatory.

### 2

■ The court also rejects SWS's reliance on qualified privilege. The bankruptcy court recognized that the filing of the Form U–5 could be qualifiedly privileged, and it placed the burden on Wakefield to overcome the privilege. SWS does not complain that the court failed to recognize a valid privilege, that it assigned the burden of proof to the wrong party, or that the privilege is absolute rather than qualified. Instead, it maintains that, to

---

15. SWS also contends that the decision must be reversed on the ground that the Form U–5 is not libelous because "it had no incremental defamatory effect beyond Wakefield's statutorily-required disclosure of bankruptcy." Appellant Br. at 25. SWS appears to maintain that, because Wakefield was required by law to disclose his bankruptcy, and considering the nature of his profession as a securities broker, he cannot demonstrate how the Form U–5 had a defamatory impact beyond the one exacted by the disclosure of his bankruptcy.

"[T]his court will not consider an argument that is inadequately briefed." *Nary,* 253 B.R. at 762 n. 23. SWS has cited no cases to support this argument. *See* Appellant Br. at 25–26. And it has offered an insufficient explanation for why, as a matter of law or fact, a finding of libel could not be based on a Form U–5 that gave false reasons for Wakefield's termination—concealing that he had in fact been discharged in violation of federal bankruptcy law—regardless of the fact that he had also filed for bankruptcy.

overcome the privilege, Wakefield was required to prove that SWS acted with actual malice, which required that SWS either knew of the falsity of the statement or acted in reckless disregard as to its truth. It argues that the bankruptcy court engaged in a *non sequitur*—i.e., it clearly erred—in finding that, because the stated reasons in the Form U–5 were false and Marsh knew they were false, SWS was also aware that the reasons were false and acted with malice. SWS contends that Marsh's knowledge that the stated reasons for terminating Wakefield were false cannot be imputed to SWS because he supplied no information for the Form U–5, which SWS's compliance officer, Phyllis Knowles ("Knowles"), signed without input from Marsh.

The question presented is whether the bankruptcy court clearly erred in finding that Marsh's knowledge was attributable to SWS. The court holds that it did not. SWS apparently attempts to minimize Marsh's hierarchical position by referring to him as Wakefield's "supervisor." Appellant Br. at 26. The bankruptcy court found, however, that Marsh was an SWS officer—a Vice President—and the manager of the branch where Wakefield worked. He was the person who hired Wakefield, conducted his pre-employment background check, and reviewed his Form U–4.[16] Marsh discharged Wakefield because he had filed for bankruptcy, and he knew whether the Form U–5 form was accurate. Although Knowles may have been the SWS compliance officer who completed the Form U–5 for submission to the NASD, she contacted Marsh to advise him what SWS intended to report. This is indicative of the importance that SWS placed on Marsh's knowledge of, and acquiescence

in, the content and accuracy of the Form U–5. When Marsh heard what SWS intended to report, he responded, "Do what you got to do. Fine." R. 310. It is a reasonable inference from the evidence that SWS was aware of the falsity of the Form U–5 from Marsh, an officer and Branch Manager, who was the ultimate source of the information. The court cannot say that the bankruptcy court clearly erred in finding that SWS knew the content of the form was false and, in turn, rejecting the application of a qualified privilege.

### 3

SWS's contention that the Form U–5's disclosure of reasons for terminating Wakefield "was, at most, an expression of opinion," Appellant Br. at 26, borders on the facetious. SWS did not express an *opinion* why it had terminated him. It represented as a *fact* that it had done so because of a disinclination to provide additional supervision that he required, when, in truth, it had actually discharged him because he had filed for bankruptcy.

### C

SWS also challenges the award of damages. The court need not reach the arguments related to the $40,000 award of additional damages because, as the court has explained, *see supra* at § II, the bankruptcy court did not award this sum for libel.

 The court now considers the award of back pay for libel. Although the parties have not cited a case that addresses the applicable standard of review, the court's own research persuades it that review of a claim of excessive lost wages awarded in a libel case would be for factual sufficiency of the evidence. *See Maritime*

---

**16.** SWS does not challenge these findings as clearly erroneous. In fact, it adopts them as true in its recitation of bankruptcy court fact findings that "are substantially correct." Appellant Br. at 1, 3.

*Overseas Corp. v. Ellis,* 971 S.W.2d 402, 406–07 (Tex.1998).

> In Texas, the standard of review for an excessive damages complaint is factual sufficiency of the evidence. When reviewing the factual sufficiency of a jury award, we use the same standard we would use for any factual sufficiency question. We must examine all of the evidence in the record, not just the evidence that supports the verdict. We will reverse on this basis only if the verdict is so against the great weight and preponderance of the evidence as to be manifestly wrong or unjust. In factual[ ] sufficiency determinations, it is the factfinder who is the sole judge of the credibility of the witnesses and the weight to be given their testimony.

*County of Bexar v. Santikos,* 2003 WL 1987155 (Tex.App. Apr.9, 2003, no pet. h.) (citations omitted) (addressing claim of excessive damages award in land condemnation case). Because the bankruptcy court decided the instant adversary proceeding without a jury, this court will apply the Texas standard in the context of clear error review.

The court has already explained *supra* at § III(F) why the bankruptcy court did not clearly err in awarding lost pay under § 525(b). The court holds, on the same reasoning, that the bankruptcy court did not clearly err in formulating the same lost pay award for libel.

\* \* \* \* \* \*

Accordingly, for the reasons set out, the judgment of the bankruptcy court is AFFIRMED in part and VACATED in part and REMANDED for further proceedings consistent with this opinion.

AFFIRMED in part, and VACATED and REMANDED in part.